**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 94-127-3 |
| | : | |
| FRANK MARTINES | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                                                     February 8, 2021

      Our jury convicted Frank Martines approximately twenty-five years ago for his central role in multiple murders, attempted murders, and extortion schemes as the underboss in John Stanfa's 1990's La Cosa Nostra criminal enterprise. Judge Buckwalter presided over the trial, accepted the jury's verdict, and sentenced Mr. Martines to life in prison under Congress's mandate and recommended by the Sentencing Commission. Sixty-seven-year-old Mr. Martines now asks we release him from his life sentence based on his age, hypertension in a prison with fear of COVID-19, and his rehabilitation while incarcerated for over twenty-five years. We commend Mr. Martines on his past and present rehabilitation. His friends and supervisors attest to his outlook and ability to meaningfully return to our community. We recognize our obligation to consider Mr. Martines's present conduct and rehabilitation as relevant when evaluating Congress's sentencing factors. We have carefully done so. But rehabilitation alone is not an extraordinary or compelling reason for release. Mr. Martines offers no other grounds for us to modify Judge Buckwalter's final sentence. Mr. Martines chose to become a made member of a murderous criminal enterprise and served as its underboss for several years. Congress and the Sentencing Commission defined the life sentence for his conduct. Mr. Martines does not offer us reasons to deviate from this sentence. We deny Mr. Martines's motion for compassionate release without prejudice.

I.   **Facts**

Frank Martines enjoyed a normal upbringing with his parents and siblings in Philadelphia. He graduated high school, married his wife at age 21, worked with AMTRAK for many years before being disabled, and then began working in the waste removal business and eventually owned a construction firm.[1] He purchased a home in Yardley where he lived with his wife and son.[2] He had no criminal history before this case.[3]

A.   **Mr. Martines managed a violent criminal enterprise as its underboss.**

But he appears to have changed his way of life in his mid-thirties. A gun shot injured him in 1983 but we have no evidence of criminal conduct involved in the shooting. Within seven years of being shot, he became a made member and later underboss of Philadelphia's La Cosa Nostra criminal Enterprise led by John Stanfa.[4] From about October 1990 through his arrest in March 1994 along with several other Enterprise leaders, the Enterprise controlled, managed, financed, supervised, participated in, and set policy concerning illicit money-making schemes.[5] The Enterprise acquired wealth by extorting others, operating illegal gambling businesses, and making unlawful extensions and collections of credit.[6] To enforce the Enterprise's rules and ensure the continued influx of money, Enterprise members and associates murdered, attempted to murder, and conspired to murder those members and associates who violated the Enterprise's rules and threatened its continued existence.[7] Enterprise members also obstructed justice, using the offices of an attorney and doctor to disguise their meetings as privileged communications.[8]

The Enterprise operated under a chain of command headed by a "boss."[9] Mr. Martines functioned as the "acting underboss" – number two in the chain of command – after someone shot and incapacitated the previous underboss.[10] Mr. Martines, among other things, organized and participated in a plot to murder several members of a rival La Cosa Nostra faction headed by Joseph Merlino.[11] Mr. Martines recruited individuals to be on various "hit" teams, provided his

2

associates with weapons to carry out various murders including bombs and handguns, and carried out violent acts himself.[12] He chose a violent murderous life as a adult after earlier living a crime-free life.

### B. Mr. Martines's conviction and history as an incarcerated underboss.

Mr. Martines entered custody after a March 16, 1994 arrest. Our grand jury returned a second superseding indictment charging then forty-one-year-old Mr. Martines and seventeen other members of the Enterprise for engaging in organized crime under the Racketeer Influenced and Corrupt Organization Act.[13] Our grand jury specifically charged Mr. Martines in eight of the thirteen counts; his charged conduct related to two murders, seven attempted murders, conspiracy to commit murder, conspiracy to extort "street tax" and protection money from legitimate businesses, extortion of several individuals and businesses including a New Jersey police detective, and the operation of an illegal gambling business.[14]

A jury found Mr. Martines guilty on all counts. Judge Buckwalter sentenced Mr. Martines to life imprisonment. Mr. Martines is currently serving his life sentence at the medium security facility of FCI-Allenwood.

We have no evidence of Mr. Martines engaging in criminal conduct before becoming a made member and serving as an underboss in the Enterprise. We are not overly surprised Mr. Martines has not participated in ongoing Enterprise criminal conduct since his arrest consistent with this upbringing. He completed over one thousand hours of courses in various subjects like anatomy, behavior modification, history, automotive services, and wellness for adults fifty years of age and older.[15] He successfully completed the CODE/Challenge Program, a nine-month intensive residential treatment program designed to facilitate institutional adjustment and reintegration into the community.[16] Letters from prison staff show Mr. Martines currently works

as an orderly and has previously worked with the prison's recreation department.[17] His disciplinary record shows he has had two infractions during his incarceration– one in 1994 for possession of drugs and the other in 2018 for fighting.[18]

### C. Mr. Martines's risk of contracting COVID-19 at FCI-Allenwood.

Sixty-seven-year-old Mr. Martines suffers from hypertension, spinal stenosis, and arthritic pain in his knees, lower back, and arms.[19] Medical professionals prescribe ibuprofen and other painkillers for his arthritic issues and lisinopril for hypertension.[20] His Body Mass Index is 23.6 – within the "healthy weight" range[21] – as of November 12, 2020 and he reports he exercises regularly.[22] On September 23, 2020, Mr. Martines complained of wheezing, a mild dry cough, and minor, intermittent chest pain around where he had been shot in the past.[23] He further complained he felt like he could not breathe deeply for the previous six or seven months.[24] The doctor recommended he perform breathing exercises and his medical records do not reflect further respiratory issues.[25] Mr. Martines has also undergone various surgeries for which he has routine follow-up exams.[26]

Mr. Martines explains FCI-Allenwood is experiencing an outbreak of "coronavirus disease 2019," also known as COVID-19. As we understand today from our own review, COVID-19 is a respiratory disease spreading mainly through droplets produced when an infectious person, even one who is asymptomatic, talks, coughs, or sneezes.[27] The virus can also be spread through the air.[28] The practice of social distancing – staying six feet away from others – can help reduce the spread of the virus.[29]

COVID-19 poses a serious global public health risk. As of February 7, 2021, the Centers for Disease Control and Prevention reported a total of 26,653,558 cases of COVID-19 in the United States with 457,762 total deaths caused by the virus.[30] People of any age with the following

conditions *are* at increased risk of severe illness from COVID-19: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); down syndrome; immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 kg/m2 or higher); heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; pregnancy; a history of smoking; and Type 2 diabetes mellitus.[31] People of any age with the following conditions *might* be at an increased risk for severe illness from COVID-19: asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pulmonary fibrosis (having damaged or scarred lung tissues); neurologic conditions (like dementia); liver disease; a body mass index greater than 25 kg/m2; pulmonary fibrosis; Thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.[32]

Mindful correctional facilities face unique challenges in controlling the transmission of COVID-19, the Centers for Disease Control has issued guidance to prisons and correctional facilities to help them prevent the spread of COVID-19.[33] Following this guidance, the Bureau of Prisons adopted aggressive safety measures, assuring "maintaining safety and security of [its] institutions is [its] highest priority."[34] Despite these efforts, some correctional facilities, like FCI-Allenwood Medium, have recently experienced outbreaks of the virus among inmates and staff members. As of February 5, 2021, FCI-Allenwood Medium reports it has four confirmed active COVID-19 cases – four inmates and zero staff members – in an inmate population of 1,110.[35]

5

Since the outbreak began, the Bureau of Prisons has confirmed 576 COVID-19 cases at FCI-Allenwood Medium having administered tests to 1,045 inmates.[36]

**II.   Analysis**

Mr. Martines moves for compassionate release arguing his age (67) and medical issues significantly increase his risk of severe illness from COVID-19 and constitute an extraordinary and compelling reason for his release.[37] The United States opposes his release, arguing his controlled medical conditions and age do not constitute an extraordinary and compelling reason for his release.[38] Even if they do, the United States argues consideration of the sentencing factors defined by Congress strongly weigh against Mr. Martines's release given his extensive involvement as a made member and underboss in the Enterprise.[39] We deny Mr. Martines's motion because he fails to present an extraordinary and compelling reason for his release and he presents a danger to the community.

While Mr. Martines cites his age and medical issues, he largely asks we focus on his rehabilitation and good behavior while incarcerated. Congress, through the First Step Act in 2018, allows federal judges to review requests for compassionate release consistent with established factors; Congress did not allow federal judges to become uber parole boards for every well-behaved incarcerated person demonstrating rehabilitation.  We cannot simply ignore Judge Buckwalter's considered life sentence because Mr. Martines's behavior today is more like his conduct as a younger man than as a made member of La Cosa Nostra in his thirties.

Congress allows us to reduce a sentence through compassionate release if we determine: (1) the incarcerated movant meets administrative exhaustion requirements, (2) "extraordinary and compelling reasons"[40]  warrant a reduction, (3) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (4) the applicable

sentencing factors under 18 U.S.C. §3553(a) warrant a reduction.[41] The applicable policy statements issued by the Sentencing Commission urge us to consider whether Mr. Martines would be a danger to the community if released.[42] Mr. Martines indisputably exhausted his administrative remedies.[43] We assess whether Mr. Martines presents an extraordinary and compelling reason for release, whether he presents a danger to the community, and whether the sentencing factors warrant a reduction.

### A.   Mr. Martines's age and well-managed medical conditions do not present an extraordinary and compelling reason for his early release.

Our Court of Appeals instructs "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release…."[44] Consistent with this reasoning, courts in this Circuit generally require a petitioner show: "(1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held."[45] While we appreciate the general age-related risks associated with COVID-19, Mr. Martines fails to demonstrate he is at a uniquely high risk of severe illness if he contracts COVID-19.

Mr. Martines's medical records show he has high blood pressure –managed by medication – and that he complained of breathing issues over four months ago. We cannot find evidence high blood pressure definitively increases risk from COVID-19, but we know individuals with "uncontrolled or untreated high blood pressure *may* be at risk of getting severely ill with COVID-19."[46] Courts routinely find petitioners with well-managed hypertension do not present an extraordinary and compelling reason for their early release. In *United States v. Ordaz*, for example, Judge Slomsky denied compassionate release to a sixty-one-year-old petitioner with hypertension and hyperthyroidism, finding these conditions did not place the petitioner at an especially high risk

of severe illness if she contracted COVID-19.[47] Judge Thompson similarly denied compassionate release to a sixty-year-old petitioner with a variety of medical issues, including hypertension, obesity, diverticulosis, diverticulitis, and a history of smoking.[48] Regarding petitioner's high blood pressure, Judge Thompson explained "he is successfully managing this condition with medication and his risk of cardiovascular disease is still relatively low."[49]

Our review of Mr. Martines's medical records confirm he is a relatively healthy sixty-seven-year-old. His medical conditions are well-managed in prison and there is no evidence he cannot continue to receive adequate medical care there. He complained of breathing issues months ago and his medical records do not show further complications. He exercises regularly. While we appreciate Mr. Martines's concerns about his health during a global pandemic, he fails to adduce evidence he is at a uniquely high risk of severe illness or death if he contracts COVID-19.

**B.     Mr. Martines presents a risk of danger to the community.**

Even assuming Mr. Martines presented extraordinary and compelling reasons for his release, Congress requires we consider whether Mr. Martines presents "a danger to the safety of any other person or to the community" before we reduce a carefully considered sentence. Mr. Martines fails to show he warrants a sentence reduction.

The Sentencing Commission's policy statement, while not binding, nonetheless offers guidance and provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[50] Section 3142(g) sets out factors we must consider when deciding whether to release a defendant pending trial.[51] These factors include: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence" or "involves a . . . firearm"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature

8

and seriousness of the danger to any person or the community that would be posed by the person's release."[52]

These factors weigh heavily against Mr. Martines's early release from his life sentence. As the underboss in the Enterprise's chain of command, Mr. Martines organized and recruited help to carry out the murders of members of the Merlino faction and even set out himself to murder on multiple occasions. He extorted several individuals and businesses and ran a gambling business. A jury found him guilty of all charges. While we recognize Mr. Martines did not have a criminal history before this point, we do not afford this fact much weight because his involvement in the Enterprise spanned multiple years. We also commend Mr. Martines for participating in numerous courses, working consistently, and otherwise spending a significant amount of time working to better himself while incarcerated. On balance, however, the extremely violent nature of Mr. Martines's crimes compel us to find he presents a danger to the community.

Consideration of the Section 3553(a) sentencing factors further weighs against Mr. Martines's release. Judge Buckwalter imposed a life sentence after carefully considering Mr. Martines's leadership role in the Enterprise and the many lives he endangered or ended. While Mr. Martines's rehabilitation is relevant to our consideration of these factors,[53] we find a reduced sentence would not reflect the extremely serious and violent nature of Mr. Martines's offenses nor does it further the aims of punishment and deterrence.[54] Congress, through the Sentencing Reform Act of 1984, eliminated parole for federal defendants convicted of crimes after November 1, 1987 and established a system of determinate sentencing.[55]

As both parties remind us, we recently denied compassionate release to another member of the Enterprise, Salvatore Brunetti, because we found he presented a danger to the community and consideration of the sentencing factors weighed against his release.[56] We found Mr. Brunetti,

9

recruited to assemble bombs and participate in "hit crews," played a key role in the Enterprise and its violent acts.[57] We explained Mr. Brunetti's participation could not be downplayed simply because he did not himself pull the trigger.[58] Mr. Martines played a more significant role as the Enterprise's underboss, working directly with Boss John Stanfa to orchestrate murders of rivals by recruiting individuals like Mr. Brunetti, providing them with weapons and bombs, and even carrying out violent acts himself. Mr. Martines, like Mr. Brunetti, presents a risk of danger to others and the community. Mr. Martines's attempt to analogize his case to Judge Rufe's analysis in *United States v. Tidwell* falls short.[59] Judge Rufe granted compassionate release to a terminally ill petitioner – serving a life sentence for operating a violent drug distribution network – who had less than one year to live.[60] Unlike Mr. Martines, a relatively healthy individual who exercises regularly, Mr. Tidwell's stage four prostate cancer diagnosis and short life expectancy presented an extraordinary and compelling reason for his release.[61] Judge Rufe further found Mr. Tidwell's "seriously impaired health," which continued to "deteriorat[e] rapidly" and required extensive medical care, significant in determining Mr. Tidwell no longer presented a danger to the community.[62] As explained above, Mr. Martines does not adduce similar evidence of deteriorated health. He is a made member of murderous criminal enterprise in relatively good health.

## III.   Conclusion

We deny Mr. Martines's motion for compassionate release without prejudice. He fails to present extraordinary and compelling reasons for his release and, even if he did, he poses a risk of danger to the community if released.

---

[1] June 13, 1996 Presentence Investigation Report ["PSR"] ¶¶ 334, 342-46.

[2] *Id.* ¶ 335.

---

[3] *Id.* ¶ 331.

[4] *Id.* ¶¶ 9-10.

[5] *Id.* ¶ 9.

[6] *Id.* ¶ 19.

[7] *Id.* ¶ 18.

[8] *Id.* ¶ 20.

[9] *Id.* ¶ 10.

[10] *Id.*

[11] *Id.* ¶¶ 22-23.

[12] *Id.* ¶¶ 23, 27, 49-50, 75, 105-106.

[13] ECF Doc. No. 807.

[14] *Id.*; PSR ¶¶ 21-231.

[15] ECF Doc. No. 2005 at 14-15.

[16] *Id.* at 23-34.

[17] *Id.* at 7-8, 10, 12, 17.

[18] *Id.* at 39.

[19] ECF Doc. No. 2006 at 2, 5, 10.

[20] *Id.* at 5.

[21] Centers for Disease Control, *About Adult BMI*, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last updated Sept. 17, 2020).

[22] ECF Doc. No. 2006 at 2-3.

[23] *Id.* at 12-13.

[24] *Id.* at 12.

[25] *Id.* at 13.

[26] *Id.* at 37, 94.

[27] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Social Distancing: Keep a Safe Distance to Slow the Spread*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated Nov. 17, 2020).

[28] *Id.*

[29] *Id.*

[30] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *United States COVID-19 Cases and Deaths by State*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last updated Feb. 6, 2021).

[31] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html) (last updated Dec. 29, 2020).

[32] *Id.*

[33] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Dec. 3, 2020).

[34] Bureau of Prisons, *Updates to BOP Covid-19 Action Plan*, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last updated Mar. 19, 2020).

[35] Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/ coronavirus/ (last updated Feb. 5, 2021).

[36] Bureau of Prisons, *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus/ (last updated Feb. 5, 2021).

[37] ECF Doc. No. 2001 at 2.

[38] ECF Doc. No. 2009 at 19-23.

[39] *Id.* at 23-28.

[40] Application Note 1 to Section 1B1.13 of the United States Sentencing Guidelines outlines circumstances constituting "extraordinary and compelling reasons" under which district courts may reduce a term of imprisonment:

    (A)    Medical Condition of the Defendant.—

    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)    The defendant is—

        (I)    suffering from a serious physical or medical condition,

        (II)    suffering from a serious functional or cognitive impairment, or

        (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the defendant.— The defendant (i) is at least 65 years old; (ii) is experiencing a serios deterioration in physical or mental health because of the aging process; and (3) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

    (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
    (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the [Bureau of Prisons], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. 1B1.13, Application Note 1(A)-(D).

[41] 18 U.S.C. § 3582.

[42] *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 406 (E.D. Pa. 2020).

---

[43] Mr. Martines exhausted his remedies with the Bureau of Prisons. He submitted his request for compassionate release to the Warden of FCI-Allenwood on September 1, 2020. The Warden denied his request on September 18, 2020, finding his medical issues do not disable him or diminish his ability to perform activities of daily living and function in a correctional environment. ECF Doc. No. 2005 at 5.  Mr. Martines plans to live with his sister and brother-in-law in their three-bedroom Philadelphia home if he is granted compassionate release. ECF Doc. No. 2001 at 23. He represents his sister and brother-in-law will provide for his needs until he can secure employment or Social Security benefits. *Id.*  He states the home has ample room for him to quarantine upon release. *Id.*

[44] *United States v Raia*, 954 F3d 594, 597 (3d Cir. 2020).

[45] *United States v. Fountain*, No. 12-155, 2021 WL 259958, at *5 (E.D. Pa. Jan. 26, 2021) (citing *United States v. Somerville*, 463 F. Supp. 3d 585, 596-97 (W.D. Pa. 2020)).

[46] Mayo Clinic, *COVID-19 and high blood pressure: Am I at risk?*, https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663 (last updated June 30, 2020).

[47] No. 98-587, 2020 WL 5993289, at *8 (E.D. Pa. Oct. 9, 2020).

[48] *United States v. Falci*, No. 17-228, 2020 WL 3410914, at *4 (D.N.J. June 22, 2020).

[49] *Id.; see also United States v. Alexander,* No. 19-32, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (denying compassionate release to petitioner with hypertension, obesity, and a benign brain tumor because the Bureau of Prisons adequately managed his conditions); *United States v. Hammond*, No. 18-184, 2020 WL 2126783, at *4 (W.D. Pa. May 5, 2020) ("[Petitioner] did not convince the court that his high blood pressure, which is being monitored and stabilized by medication, makes him particularly vulnerable."

[50] *U.S. v. Clausen*, No. 00-291-2, 2020 WL 4260795, at *8 (E.D. Pa. July 24, 2020) (citing *Rodriguez*, 451 F. Supp. 3d at 406) (quoting U.S.S.G. § 1B1.13(2))).

[51] *Id.*

[52] *Id.* (citing 18 U.S.C. § 3142(g)(1)–(4)).

[53] *See Pepper v. United States*, 562 U.S. 476, 491 (2011) ("[E]vidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing.").

[54] *See United States v. Sosa*, No. 05-44-1, 2021 WL 65476, at *5-6 (E.D. Pa. Jan. 7, 2021) (denying compassionate release to the leader of an organized gang involved in violent crimes because the sixteen years he served of his life sentence did not reflect the nature and circumstances of the offenses or promote just punishment).

---

[55] *United States v. Jackson*, 268 F. App'x 873, 875 (11th Cir. 2008) (citing *Gozlon-Peretz v. United States*, 498 U.S. 395, 400 (1991)); United States Sentencing Commission, *Life Sentences in the Federal System* (February 2015), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf.

Our holding does not preclude Mr. Martines from seeking further relief from the Bureau of Prisons. Federal prisoners may earn reduced sentences for good behavior. The federal prisoner "good-time" statute gives the Bureau of Prisons discretion to reduce a sentence for "satisfactory behavior":

> (a)   Date of release.—A prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence as provided in subsection (b).
>
> (b)   Credit toward service of sentence for satisfactory behavior.—
>
>> (1)   [A] prisoner who is serving a term of imprisonment of **more than 1 year other than a term of imprisonment for the duration of the prisoner's life**, *may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term,* **subject to determination by the Bureau of Prisons** that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations.

18 U.S.C. § 3624 (emphasis added).

"[Good Conduct Time] is indisputably administered by the [Bureau of Prisons], which is charged with determining whether each eligible prisoner has earned good time credit within a given year, as well as the amount of credit that the prisoner is entitled to receive, and the date on which the prisoner has served out his sentence." *Sash v. Zenk*, 344 F. Supp. 2d 376, 382 (E.D.N.Y. 2004), *aff'd*, 428 F.3d 132 (2d Cir. 2005), *as amended on denial of reh'g*, 439 F.3d 61 (2d Cir. 2006).

[56] *United States v. Brunetti*, No. 94-127-13, 2020 WL 4516541, at *8-9 (E.D. Pa. July 31, 2020).

[57] *Id.* at *8.

[58] *Id.*

[59] 476 F. Supp. 3d 66, 73-80 (E.D. Pa. 2020).

[60] *Id.*

[61] *Id.* at 73-75.

[62] *Id.* at 76-80.